## Clark *v.* Cook.

*Sheriff—Special deputies—Contract to reimburse—Burden of proof.*

The furnishing by the sheriff to mine owners of special deputies pending a strike is not unlawful although the sheriff is not legally required so to do, it being outside his official duty.   A contract upon the part of defendants to pay such special deputies or to reimburse the sheriff for his expenditures in that behalf is enforceable at law, but the burden is upon the plaintiff, the sheriff, to establish by evidence that the defendants had promised to pay.

*Evidence—Contract to reimburse sheriff for deputies.*

In an action by the sheriff to recover for the expenses of special deputies furnished for protection of the defendants' works, it is proper to admit evidence that the defendants had in the same manner ordered special deputies upon former like occasions and had paid for them, as tending to establish that defendants had actual knowledge that the furnishing of these deputies was not within the line of the sheriff's official duty, and that they could not demand such service as a matter of right.   Such evidence is also admissible as tending to show a course of dealing between the parties with regard to the same subject-matter, and as tending to throw light upon the probabilities or improbabilities of their irreconcilable accounts of the oral

arrangement made between them in the transaction out of which the litigation arose. It was also proper to allow plaintiff to ask defendant what was his understanding in view of what he had said and of the previous course of dealing.

*Contract—Meeting of mind—Charge of court.*

The trial judge was correct in stating to the jury thau they must not only arrive at the conclusion that there was a union of minds, one agreeing to furnish men if the other would pay for them and the other agreeing to accept the service with the understanding that he should pay for them, but that they must reach that conclusion from something that was expressed between the parties.

*Contract for special deputies—Set-off—Duties of sheriff.*

It appearing that the services of special sheriff's deputies had been accepted and retained, the defendant may not defend against his liability to pay for them, on the ground that they had not done all that he expected of them, or that the sheriff had failed to perform his duty as peace officer. Nor may he set off or recoup damages caused by the strikers, against the money expended by the sheriff for the special deputies, when such damages could not result from any failure of the sheriff to perform any duties growing out of the contract under which the parties were acting.

*Sheriff's duties as peace officer, not contractual.*

The official duty of the sheriff is not founded in contract relation and it is against public policy that any private contract should be made with regard to the manner in which he, as sheriff, shall discharge the duty imposed upon him by law to perserve the public peace.

Argued April 17, 1900. Appeal, No. 125, April T., 1900, by defendants, in suit of J. V. Clark against J. V. H. Cook at al., trading as Cook & Sons, from judgment of C. P. Washington County Feb. T., 1899, No. 186, on verdict for plaintiff. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Affirmed. Opinion by W. D. PORTER, J.

Assumpsit. Before McILVANE, P. J.

It appears from the record that plaintiff sued to recover his expenses for the per diem pay of the special deputies sent to the defendants' mines amounting to $862. To this action defendants set up two defenses :

1. That the defendants had made no contract with the plaintiff, whereby they had become legally bound to reimburse the sheriff for these expenses.

2. That, assuming that such a contract or undertaking had

been made, the defendants set up against a recovery upon it that the plaintiff, having been applied to as the sheriff of the county for the protection of their property and business, against what threatened to be and afterwards was an actual and effective breach of the public peace and a gross private injury to the defendants, he had the right, duty and the power easily to afford that protection, but would not and did not.

On the trial many offers were made by the defendants to show conditions existing at their mine during its investment; specific acts and conduct of the besiegers; their intimidating threats and declarations made directly to defendants' employees, and publicly at a mass meeting held at Canonsburg, but a short distance away, attended by some of defendants' employees; approaches and assaults upon the defendants' miners when on their way to work, and such conduct about their dwellings at all hours of the night, as that some went to the woods to sleep; and such a state of terror and intimidation produced that the defendants' employees at work and willing to work were reduced at one time to six in number, to the injury of the defendants to a large amount, capable of being shown from their books and papers; and, further, that the sheriff and his deputies, being appealed to by the defendants to prevent these turbulent and injurious acts and conduct, and he could have done it without difficulty, refused to permit his deputies to act except by mere "request and persuasion," the sheriff asserting that the strikers had the right to march and countermarch as they pleased about the defendants' mines, and he could not interfere with them in their resulting acts and conduct so long as they confined their "processions" to the public highways and resorted to no acts of violence and bloodshed in attacks upon persons or property.

These offers, however, were refused, the court holding and instructing the jury, in effect, that the plaintiff was under no legal duty to furnish special deputies to the defendants upon their application, but that when he chose to furnish them, his full duty was discharged if his deputies so managed that the strikers did not resort to violence or bloodshed; and that the question was a matter of good faith on the part of the sheriff, and if the sheriff "acted in good faith, in view of the knowledge he had and with the legal advice he had, and his deputies did

the best they could under the circumstances,"—the last words in the general charge to the jury,—then the second defense would not avail the defendants.

[At the trial the court admitted on plaintiff's offer, against objection of defendants' evidence, that on prior occasions defendants had asked plaintiff for and had been furnished with deputies. The purpose being to show that the request for the deputies made on July 7, 1897, was with full knowledge of what such request involved on the part of defendants as to payment by reason of the experience of the previous year.

It being followed by evidence on a day following the order, in a conversation with the plaintiff over the telephone, the plaintiff told the defendant at that time what the cost of these men per day would be and directed him to place these men upon the pay roll so that their pay would be taken care of down there ; that he notified the plaintiff to send the men with that understanding ; that at that time at that conversation there was no objection or protest on the part of the defendant to that arrangement. To be followed by evidence that Mr. Cook did undertake to pay at a less rate the men so sent down; and that to be followed by evidence of his being called up at a time when he failed to settle with these men and they had been settled with, in the absence of the plaintiff, at his office, and was then talked to concerning the pay and he requested the sheriff to settle with the men directly himself, the sheriff then understanding the words to mean that he would settle with him after he had settled with the men.] [1, 2]

[J. V. H. Cook, one of the defendants, under cross-examination, after testifying that defendants had been operating prior to 1895, during the term of office of Mr. Cherry, a prior sheriff, was asked : " During his term in the sheriff's office you had called for deputies ? " Offer asked for.

The witnesses having distinguished the payment of the deputies in 1895 from those usually occurring or from the strike of 1897, I wanted to inquire of him now upon cross-examination as to his call for deputies under Mr. Cherry's administration of the office of sheriff of Washington county, and if he did not then pay for them. To be followed by inquiries of the defendant if he does not know that the universal custom and practice of the office was that upon a call for deputies at any

mine from the sheriff's office, the mine owner or person calling for them was responsible for their pay.

Objected to as incompetent and irrelevant, and not a cross-examination of the witness.

The Court: Objection overruled and offer admitted; I think it goes to the credibility or integrity of the explanation of the witness.

Under this offer admitted, the witness testified that defend-ants had called once for deputies from the sheriff of the county prior to the administration of the plaintiff; he presumed they had been sent from the office about the same way they were in 1897, and he had paid for those men; and that he did not know that the universal custom and practice of coal operators, in the county and district, was that the mine owner would take care of the pay for the services.] [3]

The same witness being on the stand the court admitted plaintiff's offer against objection of defendants, said offer and objection being as follows:

[During the week, the first week that those men were down there, recollecting how you had called them, what you had said to the sheriff, what the dealing had been, for years, with the sheriff's office prior to that time, and all that, did you understand that what you had done did not involve any obligation on your part to pay him for those men? If those men accomplished the object—

I want to know what, up to that time, before any difficulty or question as to what they did arose, what was then your belief and obligation, as you understood it?

Objected to as a question of law, and not a question of fact.

The Court: It is a very important question in this case, whether or not he rests his defense upon the bad faith of the deputies in not doing what they ought to have done, or whether he denies expressly that at the time he ordered these men he expected the sheriff to pay for them himself. The objection is overruled, and, on request of defendants, exception allowed and sealed.] [4]

Plaintiff submitted the following point:

[1. That there is no sufficient evidence in the case to authorize the jury to find that the defendants expressly agreed to pay to the plaintiff his expenses in furnishing deputies for

service at the defendants' mines during the strike, and the verdict of the jury should be in favor of the defendants. *Answer:* Refused. We refuse to give you binding instructions on that question; we think it is a question of fact that you must determine.] [6]

The court charged the jury in part as follows :

[Now, gentlemen, an agreement is a union of minds upon some proposition. Were these deputies sent down by Mr. Clark with the belief and understanding on his part that they were to be paid for, and were the services received by Mr. Cook with the belief and understanding that he was to pay for them?] [5]

[Offers of defendants showing the condition of affairs about the mines during the time the strike continued, special deputies being in charge during the entire period, were refused.] [7–16]

[The court refused the defendants' offer to show by books and papers and other competent evidence the loss and damage to them by reason of the plaintiff's failure of performance.] [17, 18]

Verdict and judgment for plaintiff for $958.34. Defendants appealed.

*Errors assigned* were (1–4) to rulings on evidence, reciting same. (5) To a portion of the judge's charge reciting same. (6) Refusal of defendants' first point, reciting point and answer. (7–16) Refusal of offers of defendants to show the condition of affairs about the mines during the time the strike continued, the plaintiff being in charge of special deputies during the entire period. (17, 18) Refusal of defendants' offer to show by the books and papers and other competent evidence the loss and damage to them by reason of the plaintiff's failure of performance. (19–24) The general charge to the jury was not a plain, intelligible and correct presentation of the law of the case, and, delivered orally in a deliberate and impressive manner, with the answers to the points delivered in a different manner, left the case as between the plaintiff and defendants, in a condition of confusion.

*R. W. Irwin* and *Boyd Crumrine*, for appellants.—The specifications of error, one to six inclusive, raise the question

whether there was sufficient evidence of a special contract between the plaintiff and defendants for submission to the jury, and whether it was properly submitted.

It being conceded by the other side that before the defendants can be called upon to reimburse the plaintiff for the pay of his deputies he must establish that the defendants expressly undertook to so reimburse him, that is, that a contract was made upon the terms that the plaintiff should furnish the force required for the purpose in view, and the defendants would pay the per diem expenses thereof.

Assuming a special contract to pay for the services of the deputies, it was error to refuse the offer of defendants to show the condition of affairs about defendants' mines during the time the strike was continued, the plaintiff being in charge of special deputies during the entire period.

Defendants were entitled to show the entire failure of the plaintiff to perform the services which his official duty and undertaking required him to perform.

*W. S. Parker*, with him *Winfield McIlvaine*, for appellee.

OPINION BY W. D. PORTER, J., July 26, 1900:

The plaintiff was, in the year 1897, the sheriff of Washington county, and the defendants were engaged in the coal mining business, their mines being located some distance from the town of Washington. In July of that year there were widely spread labor disturbances and the miners throughout the country were engaged in a general strike, but the employees of the defendants still continued at work and the mines were in operation. On Sunday, July 11, 1897, the defendants telephoned to the plaintiff that they expected a visit of a delegation of striking miners, coming with a view to induce the employees of the defendants to join in the strike, and requested the plaintiff to send them three special deputies for the purpose of protecting their property and employees. The sheriff, on the afternoon of that day, procured two special deputies and sent them to the premises of the defendants, where they reported for duty to those who represented the defendant firm. A third special deputy was sent to the defendants the next day, and from time to time thereafter special deputies were supplied to them, as they

required, and upon their express orders. There is no dispute as to the number of days which these special deputies served, or as to the amount. of the compensation which they received from the sheriff. The men so sent were deputized by the sheriff and were sworn in the following form, after the usual formal part of an oath: "That you will keep the peace as a special deputy at Cook's mines."

That the furnishing of these special deputies to the defendants was not, under the circumstances, unlawful, but that the sheriff was not legally required so to do and that it was outside of his official duty is well settled. A contract upon the part of the defendants to pay these special deputies, or to reimburse the sheriff for his expenditures in that behalf, would be enforceable at law. The burden is upon the sheriff to establish by evidence that the defendants had promised to pay: McCandless v. Steel Company, 152 Pa. 139. The only way of suppressing riots which the sheriff could be legally required to use was the posse comitatus, the armed power of the county: Curtis v. The County of Allegheny, 1 Phila. 237. While the defendants, therefore, could not compel the sheriff to furnish special deputies, to be by the sheriff paid a reasonable compensation, the furnishing of such deputies and their employment by the defendants in the protection of their property was not unlawful, and an agreement upon the part of the defendants to pay such deputies at a rate agreed upon would be binding. The soundness of this position is conceded by the defendants. The plaintiff alleges that these special deputies were furnished to the defendants under an express agreement that they should pay the men $2.50 per day, and that they were to be kept by the defendants during the term of their employment. The defendants deny liability upon two grounds, first, that they never made any agreement to pay; second, that in failing to prevent the delegation of striking miners from marching back and forth upon the public highways in the neighborhood of defendants' works, headed by a brass band and singing songs and using opprobrious epithets towards the miners employed by the defendants, while passing the premises of the defendants, and so interfering with defendant's business, the sheriff violated his duty as the highest peace officer of the county, representing the commonwealth, and also violated his duty in said contract relation with the defendants.

A careful consideration of the evidence leads us to the conclusion that to have withdrawn the case from the jury upon the first ground urged by the defendants would have been a proceeding without warrant. The negotiations with regard to the furnishing of these deputies were carried on by the plaintiff and the senior member of the defendant firm. Both agree in their testimony that Mr. Cook, on July 11, 1897, which was a Sunday, called the sheriff by telephone and requested him to furnish three special deputies for the protection of their works, and that such deputies were furnished at that time and subsequently, as required, and that such deputies continued to be so employed by the defendants down until the end of the strike, in September, 1897. No agreement was made on that Sunday with regard to the compensation to be paid the special deputies. The plaintiff testified: "On the following morning, July 12, I called Mr. Cook up on the telephone and wanted to know if he wanted the third man; he told me he did; then I talked to him about putting the men on the pay roll. Q. Well, go on, and tell us all the conversation that passed between you and him then. A. I told him, after some question passed that he asked me, that I had paid the men always before $2.50 a day and that they were kept, and I expected him to put them on the pay roll. Q. Well, what did he say in reply to that? A. As I understood, he agreed to it. Q. What did he say? A. I can't just tell you the exact words, that he would take care of them or see to it; I can't tell you just the exact words he used." The plaintiff further testified that for some days in the latter part of the same week he was absent from his office, and upon his return, the first of the week following, he found that some of these special deputies had been paid at the sheriff's office during his absence, and thereupon he called Mr. Cook by telephone and "asked him something about the pay of those men, that I understood he was to put them on the pay roll. Q. You said to him that? A. Yes, sir; he said to me 'I would rather you would settle with the men,' which I did." The witness testified further: "Q. Then when next, at any time, did you have any further talk with Mr. Cook concerning this matter? A. The next time that I had any talk with him about it that I remember of was in Mr. Crumrine's office; I wanted—I had sent him a bill for $400 or $500, or something near $500 for the men

that had been down there, and I asked him for the pay for them, demanded to know whether I was going to get that money or not, and he made the remark if I would give him protection he would give me a check then; I thought he had all the protection I could give him, and Mr. Crumrine says to Mr. Cook, 'You can't say that the sheriff has not been protecting you, or that you have not been protected,' something to that effect; and there was maybe a little more talk, and Mr. Crumrine turned around in his chair and said, 'Sheriff, I would withdraw the men.' I got up, walked downstairs and came to the telephone pole here. . . . Mr. Cook came up the street behind me and he says, 'Sheriff don't withdraw your men, I will see that you get your pay.'" The men were not withdrawn and remained until their services were no longer needed. The plaintiff further testified, on cross-examination, with regard to the conversation on Monday, July 12: "Q. And what did you tell him then? A. And I also said to him in that conversation that I wanted him to put the men on the pay roll and pay them himself, that I wouldn't charge anything for my services. Q. For your personal services? A. Yes, sir. Q. Did he say he would, or did he say anything at all? A. He talked to me about the pay, the amount that they paid the men, and I told him I had paid them $2.50 and that they kept them, they were paid $2.50 and kept." If the jury believed this evidence it was unquestionably sufficient to sustain a finding that the defendants had agreed to pay these special deputies $2.50 a day and to keep them while they were employed upon their premises. It is true that Mr. Cook absolutely denied all of these conversations, but it was not for the court to say which of these men told the truth, and the question was properly submitted to the jury. We must accept it as a settled fact, therefore, that the defendants did agree to pay for these deputies. The admission of evidence that the defendants had in the same manner ordered special deputies upon former like occasions and had paid for them, was proper as tending to establish that the defendants had actual knowledge that the furnishing of these deputies was not within the line of the sheriff's official duty, and that they could not demand such service as a matter of right. Such evidence was admissible for the further reason that it tended to show a course of dealing between the same parties with regard

to the same subject-matter, and as tending to throw light upon the probabilities or improbabilities of their irreconcilable accounts of the oral-arrangement made between them in the transaction out of which this litigation has grown. The first and second assignments of error are overruled.

The third assignment, in so far as it specifies the overruling of the objection to the admission of evidence as to a custom or practice of the sheriff's office of Washington county, would have been fatal to the plaintiff's case upon this appeal if the answer of the witness had been what plaintiff's counsel manifestly expected. It was the defendant who was asked to testify as to the existence of this custom, and he flatly denied the existence of any such custom. Under the offer to prove the custom no evidence of its existence was produced, and the plaintiff was thus saved from the consequences of his persistency in attempting to force such evidence upon the consideration of the jury. The third assignment of error is overruled.

The question asked of the defendant in his cross-examination as to what was his understanding during the first week and before the actual trouble, in view of what he had said to the sheriff and the course of dealing between them in former years, as to whether what he had done did not involve an obligation on his part to pay, was eminently proper, considering the absolute contradiction between the parties as to what had actually occurred with regard to an express promise to pay. It was asking the defendant to say what had been his understanding of the agreement before there was any trouble with regard to it. The answer of the witness was that he did not then understand the employment of these special deputies, under the circumstances in anticipation, as outside the legal duties of the sheriff, and that, therefore, he did not consider that there was any obligation on him to pay. Even if the question had been objectionable, the answer to it did no harm, and the fourth assignment is dismissed.

The language of the court which is assigned for error in the fifth specification was not objectionable in itself. The language which almost immediately followed, taken in connection with the evidence complained of, presented the case to the jury in a manner of which the defendants certainly had no right to complain; for the learned judge said: " You must not only ar-

rive at the conclusion that there was a union of minds here of these two parties, one agreeing to furnish the men if the other would pay for them, and the other agreeing to accept the services with the understanding that he should pay for them, but you must reach that conclusion from something that was expressed between the parties." This so clearly presented the matter in controversy to the jury that no man, whether in the jury box or out of it, could have been misled, and the specification is dismissed.

The seventh and eighth specifications of error relate to the refusal of the court below to admit evidence as to what was said by certain parties at a public meeting held at Canonsburg. This meeting was held at a point distant from the mines. There was no offer to show that the sheriff had any control over the persons who made the speeches, nor was there any offer to show that any of the speakers had been connected with the camp of the strikers, near the mine of the defendants. That the irresponsible vaporings of a man and woman who made speeches to a crowd of people at a point distant from the locus in quo, could not, under the circumstances of this case, affect the right of the parties under this contract is manifest.

All of the remaining assignments of error have reference to the rejection of evidence in support of, and the rulings of the court upon the principles governing the second ground upon which the defendants sought to avoid liability. This inner line of defense was that the sheriff, even if the defendants had made a contract to pay the special deputies, having failed to stop the marching and countermarching of the striking miners upon the public highways in the vicinity of the defendants' works, and the business of the defendants having been interrupted as a consequence, there could be no recovery in this action. There was no allegation that the special deputies had failed to faithfully perform every duty required of them by either the sheriff or the defendants. The sole reliance of the defendants upon this branch of the case was, first, that the sheriff had violated the duty which he had undertaken to perform under his contract relation with the defendants; second, that he had failed to perform his official duty as the highest peace officer of the county, representing the commonwealth. The defendants undertook to show that because of such failure of the sheriff to

discharge his duty their business had been interrupted and they had suffered damages, as a consequence, which they proposed to recoup, or set off, against the claim of the sheriff for the money expended for these special deputies. From the record, as printed by the appellants, it appears that the only plea in this action was the general issue, non assumpsit. The defendants, under this plea, were entitled to be recouped for any damages which they suffered because of the failure of the sheriff to perform any duties growing out of the contract under which the parties were acting: Hunt v. Gilmore, 59 Pa. 450; Glennon v. Lebanon Mfg. Co., 140 Pa. 594; Watson v. Philadelphia, 142 Pa. 179. It is, therefore, important to determine what that contract was. The defendants deny that there was any contract whatever. The only contract which the jury would have been warranted, under the evidence, in finding to have been in existence between the parties was, that the sheriff should furnish special deputies for the protection of the property and the persons of the defendants and their employees, and the preservation of the public peace. There was no evidence or offer to produce evidence that the sheriff had entered into a contract relation to keep the mines of the defendants in operation, or to prevent the striking miners from marching upon the public highways. There was no special term of service fixed by the contract for the special deputies, or any one of their number. Under the undisputed facts the defendants, as a matter of law, had a right to dismiss all of these special deputies, or any one of their number, or to notify the sheriff to withdraw them, at any time. The defendants admit that until the striking miners began their marching upon the public highways the services of the special deputies were satisfactory. The senior member of defendant firm testified that, within a day or two after the marching began, he had an interview with the sheriff and requested him to stop the marching and countermarching, and that the sheriff declined to do so. This was an express notice to the defendants that the sheriff would not undertake to prevent persons from passing along the public highways. The defendants, from that moment, knew the manner in which the special deputies would continue to discharge the duty to protect their property and their persons and those of their employees.

VOL. XIV—21

The employment of these special deputies was outside of the line of the sheriff's official duty, and the contract with regard to them is to be construed and enforced in the same manner as other contracts. When an employer gives to his employee materials to be manufactured into a finished product, the employee representing himself to be possessed of the requisite skill, the employer may not be able to form an intelligent conclusion as to the manner of performance by the employee until the work is finished. If the product is ruined because of negligent and unskilful workmanship, the damage to the employer is the result of the failure of the employee to execute his contract. In an action brought by the employee to recover his wages, in such a case, the employer is entitled to be recouped for the damages which he has suffered, growing out of the contract relation. When the service to be performed by an employee is of such a character that the employer sees and understands all the time, from day to day, the manner of performance, a different question is presented. If the employer has notice in advance that the employee does not undertake to perform in a manner specified, and the contract is one which is terminable at any time, at the option of the employer, it is for the employer to elect whether he will accept the service in the manner in which it is tendered and pay for it in accordance with the terms of his contract. In the present case the jury has found that the defendants had agreed to pay for the services of these deputies. The service was satisfactory down to the time when the strikers began to march upon the public highways. The defendants then notified the sheriff that the marching must be stopped, and the sheriff replied that this could not be done. The defendants were then put to their election, to accept the services of the special deputies and pay for them as under their contract they had agreed to do, or to terminate the contract, as they had a right to do, and notify the sheriff to withdraw the deputies. They had a right to sever their lawful contract relation with the sheriff and notify him that they relied upon him to give them the protection which he was legally required to do, through the instrumentality by law provided for that purpose. They had no right to exact of the sheriff a peculiar service which the law did not vouchsafe to every other citizen. Having elected to

continue the contract relation, with full knowledge of the manner in which the service was to be performed, having the power to end the contract at any moment, they are presumed to have renewed the contract day by day. A party cannot thus mislead one with whom he deals under a contract relation, and then, after having accepted the services for months, be heard to allege that the contract has not been performed to his liking.

The claim of the defendants that they have a right in this action "to set off damages suffered by them because of a violation by the sheriff of his official duty as the highest peace officer of the county, representing the commonwealth," cannot be sustained. It is not necessary to put this upon the narrow ground that the defendants have not pleaded payment, and, for that reason, have not brought themselves within the terms of the defalcation act of 1705, 1 Sm. L. 49: Coulter v. Repplier, 15 Pa. 208; McQuaide v. Stewart, 48 Pa. 198. The ofcial duty of the sheriff did not grow out of this contract and was in no sense dependent upon it. The defendants entered into this contract because they deemed the means to which they resorted for the protection of their property more satisfactory than those which the law required the sheriff to employ for that purpose. The official duty of the sheriff is not founded in contract relation, and it is against public policy that any private contract should be made with regard to the manner in which he, as sheriff, shall discharge the duty imposed upon him by law to preserve the public peace. This last defense, therefore, was not an attempt to set off unliquidated damages resulting from an independent contract. It was an attempt to set off damages resulting from a neglect of official duty and founded upon a technical tort. That such damages are not the subject of set-off under our defalcation act is well settled: Ahl v. Rhoads, 84 Pa. 319. The amount which the sheriff sought to recover in his action was due to him personally. The unliquidated damages which it was sought to set off against this claim were recoverable, if at all, against the sheriff in his official capacity, and, therefore, could not be defalked: Tagg v. Bowman, 99 Pa. 376; 108 Pa. 273. All the assignments of error are dismissed.

Judgment affirmed.